UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Kasey Woodman &
Mark Foley

     v.                                        Civil No. 18-cv-156-LM
                                                          Opinion No. 2022 DNH 060 P
United States of America


**MEMORANDUM AND ORDER**

In January 2015, Kasey Woodman suffered a severe laceration of her vagina, perineum, and anus while giving birth at Madigan Army Medical Center, Joint Base Lewis-McChord, Washington.  United States Army physicians repaired the laceration, but, as the laceration healed, Woodman developed a rare but fixable complication known as a rectovaginal fistula.  Even the government's expert agreed that, if performed properly, the success rate for this surgery was higher than 90%.  Here, however, the surgery was unsuccessful.  Over the next three years, Woodman underwent seven subsequent surgeries, including a highly invasive surgery to divert her fecal matter called an ileostomy, until the fistula was ultimately successfully repaired.  Following the repair, Woodman underwent an eighth surgery—plastic surgery to improve the disfigurement she had suffered as a result of the prior surgeries.

In this suit, Woodman alleges that Army physicians should have prevented her perineal laceration (that occurred during childbirth), failed to properly repair the perineal laceration, and failed to properly repair her rectovaginal fistula (that

developed following childbirth).  Woodman alleges that had Army physicians followed the standard of care, she would not have needed the follow-up surgeries. She also alleges that the physicians who first attempted to repair the rectovaginal fistula were unqualified to perform the surgery.  Woodman's ex-husband, Mark Foley, brings a loss of consortium claim premised on Woodman's injuries.

Woodman and Foley bring their suit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1).  The court held a bench trial in October 2021.  This opinion constitutes the court's findings of fact and conclusions of law.  See Fed. R. Civ. P. 52(a).

In brief, Woodman has not demonstrated that the United States's medical providers breached the standard of care as to preventing or repairing her fourth-degree perineal laceration.  Woodman has shown, however, that they breached the applicable standard of care by attempting to repair her rectovaginal fistula before her tissue was healthy enough to perform the surgery.  The failure to properly perform the first fistula repair transformed a complication with a highly favorable prognosis into a complex, recurring medical problem that took years and many additional surgeries to resolve.

As a result, Woodman endured several years of considerable pain, suffering, and mental anguish.  The repeated surgeries left Woodman with scars and deformities.  Her marriage devolved.  And even though the fistula was eventually repaired, Woodman is likely to require future surgeries to correct urinary and fecal

incontinence.  For those reasons and more discussed below, the court awards damages to Woodman in the sum of $5,000,000, and damages to Foley in the sum of $150,000.

## Standard after Bench Trial

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).  Here, the court is the trier of fact; when facts are in dispute the court weighs the evidence and makes findings of credibility.  See Sawyer Bros., Inc. v. Island Transporter, LLC, 887 F.3d 23, 31 (1st Cir. 2018).  Because the events that give rise to this case occurred in the State of Washington, the substantive law of Washington governs.  See Gonzalez-Rucci v. U.S. I.N.S., 539 F.3d 66, 69 (1st Cir. 2008).

By agreement of the parties, the court held this FTCA bench trial by videoconference.  See doc. nos. 29, 37.  The parties agreed to abide by several conditions to ensure the integrity of a trial conducted remotely.  See doc. no. 29-2. Trial took place between October 21 and October 28, 2021.  Following the presentation of evidence, the court heard oral argument from Woodman and the United States and took the matter under advisement.  The court also requested and received supplemental briefs from the parties on several issues.  Doc. nos. 40, 42.

**Findings of Fact**

I.    <u>Expert Witnesses</u>

During trial, Woodman presented the expert testimony of urogynecologist[1]

Dr. Roger Lefevre, director of pelvic reconstructive surgery at Beth Israel Deaconess

Medical Center in Boston, Massachusetts, and general surgeon Dr. Stephen Camer,

former chief of surgery at New England Baptist Hospital.  The United States

presented the expert testimony of urogynecologist Dr. Patrick Culligan, director of

the urogynecology department at Valley Medical Group in New Jersey.  In addition,

several medical providers who treated Woodman testified, including gynecologist-

oncologist Dr. Jan Sunde, obstetrics and gynecology physician ("OBGYN") Dr.

Shannon Renfrow, OBGYN Dr. Coleen Korzen,[2] urogynecologist Dr. Christa Lewis,

urogynecologist Dr. Christine Vaccaro, and nurse-midwife Judith Graham-Bilos.

Throughout this opinion, the court has included specific credibility findings

pertinent to individual witnesses and expert opinions.  As a general matter, the

court found Dr. Lefevre's testimony most credible and therefore gives it the most

weight.  The court likewise found Dr. Culligan's testimony to be credible.  However,

Dr. Culligan's testimony was not as comprehensive and persuasive as Dr. Lefevre's

---

[1] The medical subspecialty urogynecology is also known as female pelvic medicine and reconstructive surgery.

[2] At the time of the events at issue, Dr. Korzen used her name prior to marriage, which was Coleen McTear.  When she testified, Dr. Korzen used her married name, Coleen Korzen.  Throughout this opinion, the court refers to Dr. Korzen using her current name.

testimony.  Thus, the court gives Dr. Culligan's opinion significant weight but less than Dr. Lefevre's opinion.

The court gives Dr. Camer's opinions the least weight.  Dr. Camer is not an obstetrician and his testimony about obstetrics issues was inconsistent with current medical practice guidance and recommendations.  For example, the testimony of both Drs. Lefevre and Culligan contradicted much of Dr. Camer's testimony about the applicable standards of care.  The testimony of the treating medical providers, such as Drs. Sunde, Renfrow, Lewis, and Vaccaro—all of whom have specialties or subspecialties in relevant medical fields—likewise contradicted many of Dr. Camer's assertions.  Finally, many of Dr. Camer's conclusions were unexplained, particularly when compared to the thoughtful explanations offered by Drs. Lefevre and Culligan.  For these reasons, the court gives Dr. Camer's opinion minimal weight.


II.    Medical Training & Regulation of Medical Practice

This case involves a question about what kind of medical training is sufficient to allow a physician to perform certain medical procedures.  During trial, several witnesses described the medical training process and the regulation of medical practice.  The process of becoming a physician capable of working independently contains several steps: medical school; residency; board certification as a specialist; credentialing; and, sometimes, a fellowship and board certification as a subspecialist.

Medical training begins with four years of medical school.  The first two years of medical school involve classroom training.  The last two years involve practical training.  After medical school, training continues in "residency," which also lasts four years.  During this period, residents develop a specialty.  These specialties include, for example, cardiology, neurology, and—as relevant in this case—obstetrics and gynecology.  First-year residents, who are known as interns, interact with patients and perform procedures from their first day.  As they progress through their third and fourth years of residency (and seventh and eighth years of medical training overall), residents may take on senior and supervisory roles.  However, when residents perform surgical procedures, an attending physician—that is, a physician who is board certified and credentialed to perform the surgery—always supervises.

In addition to a specialty field, some physicians elect to continue training in a subspeciality through a fellowship, which can last an additional three or four years after residency.  As relevant here, OBGYNs can continue their training into subspecialty fields of, among others, gynecology-oncology, urogynecology, and maternal-fetal medicine.

Specialty fields such as OBGYN and subspecialty fields such as urogynecology and gynecology-oncology have governing boards.  These governing boards issue practice guidance and regulate who is "board certified" in a particular field.  OBGYNs and OBGYN subspecialists obtain board certification from the American Board of Obstetricians and Gynecologists ("ABOG") and receive practice

guidance from the American College of Obstetricians and Gynecologists ("ACOG"). The American Urogynecologic Society ("AUGS") also issues practice guidance in the urogynecology field.

ABOG administers examinations—known as "boards"—for each field that, if passed, allow the physician to say they are "board certified" in that field.[3]  In addition, these and other organizations issue guidance to practitioners in the form of practice bulletins and opinions.  Physicians use this guidance to determine acceptable and best practices.

The medical knowledge and practices in different specialties and subspecialities overlap.  For example, a board-certified urogynecologist, gynecologist-oncologist, or colorectal surgeon can be expected to have training and experience performing surgeries on the female pelvic anatomy.  Nonetheless, the focal points of the subspecialties are different: colorectal surgeons are more familiar with rectal anatomy and approach surgeries from that perspective (e.g., a colorectal surgeon attempted to repair Woodman's fistula through a rectal route); urogynecologists are more familiar with the vagina (the urogynecologists who attempted to repair Woodman's fistula approached through the vagina); and gynecologist-oncologists are most familiar with cancers and complex surgeries involving atypical anatomy through multiple different areas of the female pelvis and reproductive system.

---

[3] Physicians maintain board certification annually through a "maintenance of certification" process.

And, finally, the medical field is regulated by medical facilities' credentialing processes.  In the credentialing process, a committee of attending physicians at the medical facility evaluates an applicant physician's training, experience, and board certifications.  After evaluating the applicant, the committee determines whether to grant or deny credentials to perform the procedures requested by the applicant.[4]

III.    Perineal Lacerations, Fistulas, and Surgeries to Correct those Problems

In this case, Woodman suffered two related injuries during and after giving birth: first, a fourth-degree perineal laceration and, second, a rectovaginal fistula. The court heard testimony from experts and treating medical providers about how and why these types of injuries occur, the surgeries used to correct them, and the prognoses for patients under varying circumstances.

A.    Perineal Lacerations

Vaginal childbirth frequently causes tears or lacerations of the mother's vagina and surrounding perineal (i.e., the area between the anus and the vagina) tissue.  Perineal lacerations are classified into four degrees of severity.  A first-degree perineal laceration is a minor tear of the vagina.  Dr. Culligan testified that physicians usually leave first-degree perineal lacerations to heal without surgical intervention because adding foreign objects like sutures to the body comes with an

---

[4] Dr. Culligan testified that physicians also undergo a yearly recredentialing process, but he noted that the process is less rigorous after a physician first obtains credentials.

inherent risk of causing harm.  Dr. Culligan noted that most mothers suffer a first-degree perineal laceration during their first vaginal delivery.

A second-degree perineal laceration is a deeper tear that goes from the vagina and skin through the muscles and connective tissue in the perineum.  Dr. Culligan testified that a second-degree perineal laceration usually requires surgical repair.

A third-degree perineal laceration is a cut from the vagina through the perineum to the external anal sphincter.  Dr. Culligan explained that a third-degree perineal laceration always requires surgical repair because the tear causes the anal sphincter to stop working correctly—meaning that it will cause incontinence—and it will not heal correctly on its own.

Finally, Dr. Culligan testified that a fourth-degree perineal laceration, which Woodman suffered, is the same as a third-degree laceration, but with an additional disruption to the rectal wall.  Dr. Culligan noted that, for purposes of surgical technique and repair, it is unnecessary to separate third- and fourth-degree lacerations because the repairs are similar: they both start at the highest point (the rectal mucosa for a fourth-degree repair) and continue down through the sphincter, perineum, and vaginal skin in layers.

Dr. Culligan testified that a fourth-degree perineal laceration repair can take up to an hour.  He added that, while the repair is not simple, it is not so complex that it requires subspecialty care.  Dr. Culligan asserted that any physician who

works on a labor and delivery floor at a hospital must be capable of performing a fourth-degree laceration repair with skill.

1.    <u>Possible Causes of Severe Perineal Lacerations</u>

Perineal lacerations are frequent and unavoidable complications of vaginal childbirth.  In the United States, first- and second-degree lacerations are common, while third- and fourth-degree lacerations occur rarely.  Nonetheless, some procedures and circumstances increase the likelihood of a mother suffering a severe laceration.

Performing an episiotomy, for example, increases the chance that the mother will suffer a severe laceration.  A midline episiotomy is when a physician intentionally cuts the vagina down into the perineum (i.e., toward the anus and rectum).  In years past, OBGYNs routinely performed midline episiotomies, based on the hypothesis that the cut would increase the room for a baby passing through the vagina—in essence, creating a minor tear to prevent a more harmful severe tear.  But medical researchers have since discovered that this hypothesis was wrong.  OBGYNs have therefore stopped routinely performing episiotomies.  As this practice has declined in popularity, the frequency of severe lacerations has decreased dramatically.

Because performing an episiotomy increases the risk of severe laceration, physicians rarely perform them and only in response to emergencies.  For example,

Dr. Korzen and nurse-midwife Graham-Bilos testified that mediolateral[5]
episiotomies are a last resort procedure to aid a medical provider in resolving
shoulder dystocia during childbirth.[6]

A mother's small size does not increase the chance of a severe perineal tear.
Rather, Dr. Culligan testified that the mother's pelvis shape determines whether
she can deliver a large baby, and the mother's pelvis shape is not determined by her
size.  As to the baby's size, Dr. Culligan testified that only babies larger than 11
pounds are likely to cause problems for a vaginal childbirth.

2.    Repair of a Fourth-Degree Perineal Laceration

A fourth-degree perineal laceration is repaired "layer by layer" first by closing
the tissue at the highest point of the tear, which is the rectal mucosa or the lining of
the rectum.  To repair a perineal laceration, a surgeon brings edges of living tissue
together so that the two pieces of tissue eventually heal into one solid piece of
tissue.  After the surgeon sutures the rectal mucosa, she recloses the anal sphincter.
The surgeon then repairs the remaining aspects of the tear in similar fashion—by
bringing two edges of tissue together—from the perineum to the vagina.  All the
sutures should be placed "tension free," because placing the layers of tissue under
tension can result in the tissue pulling apart, which reduces the chance that the

---

[5] A mediolateral episiotomy, as opposed to a midline episiotomy, is a cutting
from the bottom left or right side of the vagina.

[6] Shoulder dystocia occurs when a baby's shoulder becomes impinged on the
mother's pubic bone.

tissue properly heals into one sheet.  OBGYNs learn the skills necessary to repair a third- or fourth-degree perineal laceration during residency.

3.    Appropriate Post-Repair Care

Post-repair care for a severe perineal laceration includes a "bowel regimen." Specifically, bowel movements after a perineal laceration should be soft.  Patients can achieve this naturally or by taking laxatives such as MiraLAX and stool softeners, such as Docusate or Colace.  After surgery, a patient may be prescribed narcotic medication which can increase constipation, but laxatives can offset that effect.  If a patient strains excessively during bowel movements, that can cause undue pressure on the repair site, which in turn can cause the repair to fail.

The proper dosage of laxatives and stool softeners to achieve the desired soft stool is different for every patient, and overuse or unnecessary use of these medications can render stools too soft or even liquid, which is also harmful to a patient's recovery after a laceration repair.  Dr. Renfrow noted, for example, that it is important for a patient to avoid both going to the bathroom 10 times a day— which occurs with too much laxative—and only going to the bathroom once every 3 or 4 days.  Accordingly, rather than directing a patient to take a specific dose of a laxative or stool softener, physicians instruct patients to adjust the dose over time depending on results.  Patients are thus left with autonomy to use their best judgment to adjust their doses over time to achieve soft—but not too soft—stools.

B.    <u>Rectovaginal Fistula</u>

One known complication of severe perineal lacerations is a fistula.  A fistula is a hole that forms between two otherwise healed tracts of tissue.  Because the area is healed, a fistula remains a permanent anatomical fixture unless surgically corrected.  In the case of a rectovaginal fistula, the hole extends from near the opening of the vagina to the rectal mucosa, creating a passageway from the vagina to the rectum.  Stool can seep through the passageway and out the vagina if the fistula is large enough or if stool is soft or liquid enough.

A fistula can be of various sizes and can start in different locations in the vagina.  A fistula can also be conic rather than cylindrical; that is, the fistula can be narrow at one end and wider at the other.  Rectovaginal fistulas themselves are usually not painful because the fistula tract lacks nerve endings.  However, because soft or liquid stool can pass through the fistula, irritation and inflammation can result and cause severe pain.

A rectovaginal fistula is not necessarily caused by the failure of a perineal laceration repair or by an improperly performed perineal laceration repair.  However, excess straining while defecating can make a rectovaginal fistula more likely to occur after a fourth-degree laceration repair.

Dr. Vaccaro testified that rectovaginal fistulas are "extremely rare."  Because they are so rare, ABOG only requires a urogynecology fellow to perform two rectovaginal fistula repairs as a prerequisite to board certification as a urogynecologist.

1.      <u>Detection of a Rectovaginal Fistula</u>

A rectovaginal fistula can be detected using several tests.  These tests include visual examination, a digital-rectal examination, and an irrigation test, which is also known as a "bubble" test.  An irrigation test—in which fluid such as diluted hydrogen peroxide is washed into the vagina or rectum to see if bubbles form—is the preferred method to confirm whether a rectovaginal fistula exists.  Because of their accuracy and simplicity, irrigation tests are favored for detecting rectovaginal fistulas as opposed to MRIs or CT scans.

In cases where the patient has too much pain to tolerate a digital-rectal examination or irrigation test, an examination under anesthesia is appropriate.  During an examination under anesthesia, physicians can use an instrument such as a right-angle clamp to determine with certainty the location and size of the fistula.

2.      <u>Repair Procedure for Rectovaginal Fistulas</u>

To repair a rectovaginal fistula, the surgeon first excises the fistula tract, which means removing the healed tissue surrounding the fistula.  The purpose of doing so is to ensure there are edges of "fresh tissue" that the surgeon can bring together to create a healthy junction of tissue.  If the fistula tract is not removed in its entirety, the fistula will not heal properly and will likely reopen.

Next, like a perineal laceration repair, the surgeon closes the fistula hole by bringing tissue on each side together in layers.  For example, the surgeon closes the

14

opening of the fistula at the rectal mucosa in one layer by bringing two edges of tissue together and suturing the tissue together. Next, the surgeon closes the interior of the hole in similar layers known as "imbricating" layers. The surgeon creates multiple imbricating layers during the repair, also by bringing edges of tissue together. Finally, the surgeon closes the opposite end of the fistula in one layer, either at the vagina or rectal mucosa depending on which end the repair started.

Because the repair involves bringing edges of tissue together in layers, the patient's tissue must be in an operable condition—sometimes referred to as having "good" tissue as opposed to "bad" tissue. "Bad" tissue is tissue that is inflamed and will not allow the surgeon to create many imbricating layers of tissue and will not heal properly after surgery. "Good" tissue, on the other hand, allows a surgeon to create multiple—as many as six—imbricating layers. A surgeon contemplating a rectovaginal fistula repair evaluates the patient's tissue to determine whether it is operable.

Timing of the repair usually drives whether the patient's tissue is operable. A patient who has a rectovaginal fistula as a complication from a fourth-degree perineal laceration suffered during childbirth typically has operable tissue about six weeks after childbirth. Dr. Culligan testified that, although 6 weeks is the minimum time necessary to have operable tissue, waiting about 12 weeks after childbirth is ideal. And, in some cases, a longer wait may be warranted if, for example, the mother is breastfeeding.

Dr. Lefevre generally agreed with Dr. Culligan's opinion that the ideal time for a rectovaginal fistula repair is between 6 and 12 weeks after childbirth. However, Dr. Lefevre, added that when the mother is breastfeeding, in a hypoestrogenic state, and presents with pain or inflammation, the operating surgeon should delay the rectovaginal fistula repair by an additional six weeks to six months to allow the pain and inflammation to subside. Dr. Lefevre noted that a patient's pain should subside before the surgeon performs the repair because pain indicates that tissue is not of operable quality.

Dr. Lefevre explained that it is understandable for a surgeon to want to relieve the patient's pain by operating immediately. But, he continued, if the tissue is not of operable quality, the surgeon will be unable to achieve enough imbricating layers to offer the best chance of a successful surgery. And, although rectovaginal fistulas are uncomfortable, Dr. Lefevre testified that they are not urgent or emergency situations. It is thus critical for surgeons to ensure that their judgment about the patient's tissue is correct before proceeding.

Once a judgment about the quality of the patient's tissue has been made, the skillset for performing a rectovaginal fistula repair is like the skillset for performing a severe (third or fourth degree) perineal laceration repair. A rectovaginal fistula repair involves similar anatomy and the surgical principles behind perineal laceration repairs and rectovaginal fistula repairs are the same. That is, sutures should be placed to minimize tension on the repair and to balance the introduction

of foreign material in the body against the need to have a secure repair that withstands the natural forces of the pelvic area.

3.  <u>Prognosis</u>

A first attempt to repair a rectovaginal fistula (the "primary" rectovaginal fistula repair) performed at the correct time on operable tissue and with proper surgical principles has a very high success rate.  Specifically, Dr. Culligan testified that more than 90 percent of primary rectovaginal fistula repairs are successful. Dr. Lefevre testified that, in his experience, the success rate of primary rectovaginal fistula repairs is approximately 95 to 98 percent.  While both Drs. Culligan and Lefevre agreed that the success rate is very high, they also agreed that no physician has a 100 percent success rate in rectovaginal fistula repairs, or for any surgery. Nonetheless, Dr. Lefevre emphasized that the success rate for a first rectovaginal fistula repair is very near to 100 percent.  In other words, when performed properly, a primary rectovaginal fistula repair is not expected to fail.  But not adhering to any one of the critical principles—for example, excising the full fistula tract, creating an adequate number of layers, and operating only when the tissue is optimized for healing—can cause the repair to fail.

4.  <u>Treatment Options after Primary Repair Failure</u>

Rectovaginal fistula repairs, if unsuccessful, usually fail within one to three weeks.  When the primary repair fails, a patient's prognosis worsens considerably.

Drs. Culligan and Lefevre both testified that a failure of the primary repair greatly increases the chance that subsequent repair attempts will also fail.

After a primary repair fails, the patient typically undergoes additional repair attempts. Each subsequent repair attempt has a much lower likelihood of success because the fistulous tract and lower pelvis is unable to heal properly as scar tissue accumulates around it. No single repair is likely to be successful after the first repair fails.

After several failed repairs, a surgeon may use an ileostomy to attempt a further repair, but it is considered a last resort. An ileostomy diverts fecal matter into an external bag which is adhered to the patient's abdomen. Because fecal matter no longer passes through the rectum, it allows inflammation and irritation around the rectovaginal fistula to subside. After the patient's fecal matter has been diverted and inflammation has subsided, more operable tissue is available for the repair, which provides an improved likelihood of success. Likewise, the repaired tissue can heal without irritation from fecal matter. However, an ileostomy is a last resort surgery because it is significantly more invasive and very uncomfortable for the patient, who must carry their fecal matter around in a bag attached to their abdomen until the ileostomy is reversed.

IV.   <u>Woodman's Medical Care and Relationship with Mark Foley</u>

    A.   <u>Woodman and Foley's Marriage</u>

Kasey Woodman and her husband Mark Foley were married in December 2012.  During the events giving rise to this suit, Foley was in the United States Army and stationed in Washington, where he lived with Woodman.  Prior to Foley's service in the Army, Woodman and Foley lived in New Hampshire.

Around the time that Woodman became pregnant, Jim Foley, who was Woodman's brother-in-law and a war correspondent, was murdered by extremists in Syria.  Jim Foley's murder received significant media coverage in the United States.  Woodman and Mark Foley's son, James Foley, is named after Jim Foley.

Prior to the complications that resulted from childbirth in January 2015, Mark Foley and Woodman had a robust and active married life.  Woodman and Foley went to baseball games, traveled across the country, went on hikes, and frequently socialized with friends.  Foley testified that he and Woodman had a "normal and vigorous" sex life.

    B.   <u>Childbirth</u>

Woodman gave birth to James[7] on January 14, 2015, at Madigan Army Medical Center.  Just prior to his birth, James was estimated to weigh about 8.5 to

---

[7] To avoid confusion with the other members of the Foley family, the court refers to James Foley by his first name throughout this opinion.

9 pounds.  Woodman testified that she was told to expect that delivery would take a long time because it was her first birth.  Indeed, Woodman spent about eight hours in labor at Madigan.

During labor, James's shoulder became stuck.  A medical note from Woodman's delivery stated "Anterior RT shoulder released with gentle traction followed by posterior shoulder remainder of the baby."  Woodman testified that a physician later told her that this note meant that James suffered a medical condition known as "shoulder dystocia" during birth.  Dr. Lefevre opined that James had shoulder dystocia during birth, though he did not explain the basis for that opinion.

Graham-Bilos, who was Woodman's treating nurse midwife and wrote the note, testified that James did not suffer from "shoulder dystocia," which she explained is a medical emergency.  Graham-Bilos testified that she would have specifically documented shoulder dystocia if it occurred.  Graham-Bilos explained that shoulder dystocia occurs when the baby's shoulder becomes impinged on the mother's pubic bone.  Dr. Sunde testified that the note could refer to "some, however slight" shoulder dystocia but he did not know whether the conditions described by the note would necessarily qualify as shoulder dystocia.

The dispute over whether James suffered shoulder dystocia during birth is not significant to this case.  At bottom, there is agreement that some "traction" was required to dislodge James's shoulder, even if it was not technically "shoulder

dystocia" or a medical emergency, as opposed to simply requiring Graham-Bilos's intervention.

Although Graham-Bilos attempted to allow the baby time to reposition without physical intervention, she ultimately determined that intervention was necessary. Graham-Bilos physically moved the baby by reaching into Woodman's vagina and adjusting his position. Graham-Bilos successfully freed the baby's shoulder, and Woodman gave birth to James, a healthy baby boy.

No episiotomy was performed on Woodman during James's birth, and no one discussed with her the option to receive one. While she was in labor just prior to James's birth, Woodman requested that medical providers perform a caesarean section. Graham-Bilos declined to consider a caesarean section. Woodman was on pain medication during childbirth and a sheet covered her legs, so she could not see exactly what was going on during childbirth. Woodman relied on reports from Mark Foley, who was present, and the treating medical providers.

Woodman testified that Foley characterized the area near where Woodman had given birth as a "bloody massacre." She testified that Foley slipped because of the blood on the floor. Graham-Bilos, who at the time of her testimony had delivered more than 5,000 babies in her 30 years of practice, testified that she would not characterize the room as a "bloody massacre" and that Woodman lost a typical amount of blood during birth. Specifically, Woodman lost about 350

milliliters of blood, which Graham-Bilos analogized to the amount of fluid in a soda can.[8]

Woodman described the scene after she gave birth as frantic and confusing; Woodman testified that Graham-Bilos exclaimed "uh oh" right after James was born and that doctors rushed into the room soon after.  Woodman testified that, at the time, no one told her what was happening.  Woodman clarified that James had aspirated meconium[9] such that he needed immediate medical attention.  The meconium aspiration was successfully treated and there is no evidence that James, who is now seven years old, suffered any adverse effects as a result.

C.   Perineal Laceration & Repair

Woodman suffered a fourth-degree perineal laceration during childbirth.  As discussed above, a fourth-degree perineal laceration is a tear from the vagina to the rectal mucosa, and it is the most severe type of perineal laceration.  Because a fourth-degree tear requires surgery, Graham-Bilos requested assistance from Madigan's on-call physicians for labor and obstetrics—Drs. Shannon Renfrow and

---

[8] Graham-Bilos indicated that one liter of blood loss after childbirth would be considered a postpartum hemorrhage.

[9] "Meconium aspiration syndrome occurs when a newborn breathes a mixture of meconium [i.e., stool] and amniotic fluid into the lungs around the time of delivery." Johns Hopkins Medicine, Meconium Aspiration Syndrome, http://web.archive.org/web/20211203012326/https://www.hopkinsmedicine.org/health/conditions-and-diseases/meconium-aspiration-syndrome.   Neither Woodman nor the United States offered testimony explaining meconium aspiration.

Jan Sunde—to repair the laceration.  Dr. Renfrow, who at the time was a third-year

senior OBGYN resident, was running Madigan's labor and delivery floor.

Dr. Renfrow testified that, when she arrived, Woodman was not bleeding,

and the situation was not urgent.  But because Woodman's laceration was severe, it

required surgical repair.  Dr. Renfrow waited for Dr. Sunde, the attending

physician, to arrive before starting the repair.  Dr. Sunde is a board-certified

OBGYN and a board-certified gynecologist-oncologist.

Dr. Renfrow testified that she and Dr. Sunde evaluated whether to move

Woodman to an operating room before starting the repair, but decided not to do so

because Woodman had good pain control from her epidural and there was good

lighting for the repair.  Dr. Renfrow stated that she and Dr. Sunde tried to make

the area as clean as possible but added that it is impossible to make the rectum and

rectal mucosa tissue fully sterile.  Dr. Renfrow also gave Woodman lidocaine, which

is a local numbing medication, for additional pain control during the repair.

Dr. Renfrow, supervised by Dr. Sunde, repaired the fourth-degree laceration.

Dr. Renfrow started by bringing together and suturing the tissue of the rectal

mucosa.  Dr. Renfrow testified that she performed the repair by ensuring the

sutures were "tension free."  Dr. Renfrow testified that she avoided pinching the

tissue too tightly and minimized the number of knots from the sutures in the rectal

mucosa because more knots can increase irritation.  Dr. Renfrow testified that she

balanced the amount of foreign material introduced to the body against the need to

have a strong enough repair that heals as intended.  Dr. Renfrow performed the

remainder of the repair as she would in a less severe laceration.  While Dr. Renfrow was performing the repair, Dr. Sunde supervised her and gave her directions throughout.

The morning after the repair, Dr. Renfrow went to Woodman's room to discuss the repair and nature of obstetric lacerations.  Dr. Renfrow discussed a bowel regimen with Woodman and explained to her that it was important to minimize strain on the repair while it healed.  Dr. Renfrow instructed Woodman to adjust the dosage of laxative and stool softener depending on whether she had loose stools.  Dr. Renfrow left the exact dose of laxative and stool softener to Woodman's judgment.

Woodman, who in years prior had problems with constipation, took a stool softener (Docusate/Colace) after her discharge from the hospital, but her stools became watery.  Woodman did not take MiraLAX because her stools were already too soft.  By January 18, Woodman's stools had become firmer but were still not hard.

D.   <u>Woodman's Treatment at Madigan in January and February 2015</u>

A few days after giving birth, Woodman began to feel "immense pain" when she went to the bathroom and had fecal matter "oozing" from her vagina.  Woodman went to the Madigan postpartum triage center.[10]  Madigan's medical records state

---

[10] Madigan's postpartum triage center is a separate emergency department at the hospital for expectant and postpartum mothers.

that on January 19, Drs. Coleen Korzen and Trista Newville saw Woodman.  At the time, Dr. Korzen was a first-year OBGYN resident and Dr. Newville was the chief OBGYN resident.

      1.    <u>The fourth-degree laceration repair had not failed or developed complications by January 19.</u>

On January 19, Drs. Korzen and Newville examined Woodman and performed various tests to attempt to find the source of Woodman's pain.  These tests included a visual examination, physical palpation of the repair site, and an irrigation "bubble" test.  Dr. Korzen concluded that the fourth-degree laceration repair had not failed, but she was concerned about the possibility that a fistula might develop as Woodman healed.  Woodman was prescribed narcotics such as fentanyl to help manage her severe pain.  Dr. Korzen also recommended that Woodman take a stool softener and MiraLAX to minimize strain during bowel movements.

      2.    <u>Woodman's condition improved through January and February</u>.

On January 30 and February 19, 2015, Woodman had appointments with Dr. Renfrow to follow up on the fourth-degree laceration repair and her postpartum triage center visit on January 19.  On January 30, Woodman told Dr. Renfrow that she was taking a stool softener daily.  Woodman also reported that she had to strain during bowel movements, but she was having a daily bowel movement.

Dr. Renfrow testified that increasing Woodman's MiraLAX dosage could have reduced her straining, but whether MiraLAX would have helped reduce straining depended on whether Woodman's stools were too soft or too hard.  The medical record from the January 30 visit states that Woodman said she was "having daily BM but often has to strain [due to] hard BMs."  Dr. Renfrow suggested that this could have meant that Woodman's stools were hard, not soft.  But Woodman testified that when she told Dr. Renfrow that her bowel movements were hard, she meant that her daily bowel movements were difficult, not that her stools were hard.  Furthermore, Dr. Lefevre testified that Woodman would not have had stool leak from her vagina if the stool was hard.  The court credits Woodman's clarification.

Dr. Renfrow performed a physical examination on Woodman on January 30, and did not see any signs of inflammation, infection, or failure of the fourth-degree laceration repair.  Woodman also reported that her pain had improved since January 19.

At the February 19 visit, Woodman told Dr. Renfrow that her pain had decreased.  Woodman had also started taking a reduced dose of pain medication, which had been prescribed to her to take as needed.  As with the January 30 visit, Dr. Renfrow performed a physical examination and, relying on Woodman's reports and the examination, concluded that Woodman's recovery was on the "appropriate trajectory."

26

E.     Physicians discover that a fistula has formed and attempt a primary
       repair in March 2015.

After having continual improvement through January and February,

Woodman had food poisoning which resulted in severe diarrhea around March 18 or

19, 2015.  Afterward, Woodman began suffering extreme pain around her lower

pelvis and vagina, as well as flatus and stool seeping from her vagina.  Woodman

went to the Madigan postpartum triage center on March 19.  Dr. Renfrow and an

attending physician, Dr. Scott Goodrich,[11] attempted to examine Woodman but

could not because of Woodman's severe pain.  They advised Woodman to wait a few

days to see if the pain subsided and to return for an examination under anesthesia

if her pain continued.

Woodman's pain continued, so Dr. Renfrow alongside Dr. Sunde performed

an examination under anesthesia a few days later on March 24, 2015.  During the

March 24 examination under anesthesia, Drs. Renfrow and Sunde discovered a

rectovaginal fistula between Woodman's vagina and rectum.  The opening of the

fistula was 1.5 centimeters inside her vagina and 2 to 3 millimeters in diameter at

that end, making it a relatively small fistula.  This fistula was the likely cause of

Woodman's pain and the flatus and stool passing from her vagina.

Dr. Sunde evaluated Woodman's tissue and determined that it was

sufficiently operable.  Dr. Sunde did not consult with the available urogynecologists

---

[11] Dr. Goodrich is a board-certified gynecologist-oncologist.

on staff at Madigan (Drs. Vaccaro and Lewis) before determining that Woodman's tissue was operable and attempting the repair.

Drs. Renfrow and Sunde repaired the fistula by cutting out the fistulous tract, closing each end (i.e., the openings of the fistula in the vagina and rectum) and by creating two imbricating layers of tissue within the tract. Dr. Sunde testified that he and Dr. Renfrow took a "team approach" in performing the surgery. After they completed the surgery and Woodman was awake, they advised Woodman to continue taking MiraLAX and stool softener to minimize the strain on the repair site.

A few days later, Woodman's symptoms—passing flatus and stool through her vagina—recurred, which indicated that the fistula repair had failed.

F.     Subsequent repairs also fail.

A series of additional failed repair attempts followed over the next several years. On June 2, 2016, Madigan urogynecologist Dr. Christa Lewis made a second attempt at the repair. A few weeks later, on June 28, 2016, Madigan urogynecologist Dr. Christine Vaccaro made a third attempt. Dr. Vaccaro testified that Woodman, who was in considerable pain and discomfort, was "very persistent" that she wanted Dr. Vaccaro to attempt to repair the fistula even though Dr. Vaccaro warned Woodman about the risk of attempting another repair so close to Dr. Lewis's attempted repair. When Dr. Vaccaro's June 28, 2016, repair failed, Dr.

Vaccaro recommended that subsequent repairs only be conducted by urogynecologists due to the complexity of the repair.

A fourth repair, performed by Dr. Srinivas Ivatury at Dartmouth-Hitchcock on September 27, 2016, also failed.  Dr. Ivatury, a colorectal surgeon, attempted this repair by approaching it through Woodman's rectum instead of her vagina.  Dr. Ivatury and Woodman both understood that the repair had a low likelihood of success because of the prior failures.  Nonetheless, they proceeded with the attempt because the next best option—an ileostomy, which as discussed above, involves diverting fecal matter into a bag adhered to the abdomen—is exceptionally invasive and unpleasant.

After the September 2016 repair failed, per Dr. Ivatury's recommendation, Woodman underwent an ileostomy on January 20, 2017.  Dr. Ivatury made a fifth attempt at the repair on July 21, 2017, which also failed.


G.    Success

On March 21, 2018—almost 3 years after the first attempted fistula repair and about 15 months after Woodman's ileostomy—Drs. Peter Rosenblatt and Nabila Noor attempted to repair the fistula.  This surgery, which Woodman described as saving her life, was successful and Woodman has not had the fistula redevelop or reoccur.

Woodman's ileostomy (in place since January 2017) was reversed on July 24, 2018.  In addition, Woodman had plastic surgery to attempt to fix disfigurement

caused by the numerous and repeated surgical repairs.  During trial, the court viewed photographs of the permanent disfigurement to Woodman's upper thigh, buttock, and lower pelvis.

Despite the success in repairing the fistula, the complications resulting from the failed primary fistula repair make it likely that Woodman will suffer from urinary incontinence as she ages.  Woodman will likely continue to suffer some pain.  Indeed, she testified that, since the fourth-degree laceration, she has "had nothing but pain."

Woodman will likely require additional surgeries in the future—approximately every 20 years—to correct future urinary and fecal incontinence. Any further children Woodman has must be delivered by caesarean section. Woodman also suffers from permanent scarring after the multiple surgeries. Woodman was 27 when she gave birth to her son in 2015, and she is 34 now.


H.   <u>Woodman and Mark Foley's marriage deteriorated after the first fistula repair failed.</u>

After the first repair of Woodman's rectovaginal fistula failed, Foley testified that life for he and Woodman became a "perpetual groundhog day."  Foley testified that he knew it was not Woodman's fault, but the marriage suffered as each surgery failed and as she became increasingly depressed over time.  Foley explained that he worked from 6 a.m. until 9 p.m., and when he came home, he would make dinner and do other chores because Woodman was unable to do those things.

Even when Woodman and Foley found time for recreation, it became a chore. Between the first failed fistula repair and the 2017 ileostomy, Woodman had to bring extra clothing and diapers with her everywhere because of the frequency of her incontinence.  And Foley testified that, for example, when they attempted to go on a weekend trip, he had to change Woodman's bandages throughout the trip, pack the car, and take care of James.

Foley felt that he had become more like Woodman's nursing assistant than her husband.  For example, Foley testified that he had to "clean[] fecal matter out of her vagina" and "help[] her in the bathroom to and from the toilet, wiping her." Woodman and Foley no longer had a sexual relationship: Foley testified that, after he effectively became Woodman's nursing assistant, his and Woodman's "intimacy went from . . . sex every night or two or three times a night . . . to roommates, to walking on egg shells around each other."  Their few attempts at intercourse were painful and felt "forced."  Woodman and Foley's inability to have sexual intercourse continued through 2019.   At the time of trial, Woodman and Foley were in the process of divorce.

V.    <u>Standards of Care</u>

The court heard testimony and received evidence about the standards of care applicable to the surgeries and healthcare involved in this case.  The court has derived the standard of care from the expert testimony, the testimony from the various treating medical providers, and the practice bulletins from governing

organizations such as ACOG and AUGS.  See Berger v. Sonneland, 144 Wash.2d 91, 111 (2001).[12]

 

A.    Labor and Childbirth: Failure to Provide Episiotomy

During trial, Dr. Camer testified that he believed Woodman's fourth-degree laceration was avoidable.  He testified that a "controlled tear of the perineum," known as a midline episiotomy, would have reduced the risk of a severe laceration but was not performed or discussed with Woodman by a Madigan medical provider. In his written opinion, Dr. Camer stated that the standard of care was to discuss providing an episiotomy with any woman who, like Woodman, is small or slight of stature.  Dr. Camer, however, acknowledged that he is not an obstetrician and that his only experience in labor and delivery lasted approximately six or seven months and occurred very early in his career.  And Dr. Camer testified that obstetrics problems should be answered by obstetricians.  Nonetheless, Dr. Camer opined on this obstetrics issue, albeit hedging that his opinions were just "questions that need to be asked."

---

[12] "Only experts who practice in the same field or have expertise in the relevant specialty may establish the standard of care."  Davies v. MultiCare Health Sys., 18 Wash. App. 2d 377, 396 (Wash. Ct. App. 2021) (citing McKee v. Am. Home Prods., Corp., 113 Wash.2d 701, 706 (1989)).  A physician with a medical degree can opine about any medical question if they have enough expertise to show familiarity with the relevant procedure or problem at issue.  Id. (citing Hill v. Sacred Heart Med. Ctr., 143 Wash. App. 438, 447(2008)).

On this issue, the court gives no weight to Dr. Camer's opinion. Dr. Camer himself testified that he does "not know the answers [] as well as an obstetrician does." The testimony at trial proved this statement correct, as the obstetricians agreed that an episiotomy is not recommended in a case like this because it increases the chance of causing the mother a severe laceration. In particular, Dr. Culligan testified that any episiotomy "instantly" increases the likelihood of severe laceration. Dr. Sunde testified that he had performed a relatively large number of severe laceration repairs when he was training to become an OBGYN because the "liberal use of midline episiotomies" by medical providers at the time caused a large number of severe lacerations.

Similarly, there was no testimony from any obstetrician supporting Dr. Camer's view that an expectant mother who is small in stature is necessarily likely to have difficulty with vaginal childbirth and should be asked whether she wants an episiotomy. Indeed, both Drs. Lefevre and Culligan explained that a mother's pelvis shape—not her stature—is more indicative of whether she will have difficulty with vaginal childbirth.[13] In short, performing an episiotomy would have <u>increased</u> Woodman's chance of severe laceration.

---

[13] Dr. Lefevre noted that medical standards sometimes warrant a mediolateral episiotomy in cases involving shoulder dystocia during birth. Dr. Lefevre did not opine about how a mediolateral episiotomy affects the chance of severe laceration. Dr. Korzen observed that the purpose of a mediolateral episiotomy is not to reduce the risk of severe laceration but to resolve a medical emergency in which a baby suffers shoulder dystocia by providing the medical provider more room to dislodge the baby. Here, Graham-Bilos resolved James's potential shoulder dystocia successfully without having to resort to a mediolateral episiotomy.

Dr. Camer also testified that "maybe" a caesarean section would have helped Woodman.  Dr. Camer did not explain why or how and did not demonstrate to the court that he knew whether a caesarean section would have been appropriate in Woodman's case.  Dr. Culligan, on the other hand, testified at length about the circumstances in which he would recommend a caesarean section, and he stated that he would start to question whether a mother is capable of vaginal childbirth if the baby weighs more than 11 pounds.  James weighed 9.1 pounds.

B.    Fourth-degree laceration repair as complication from childbirth

Dr. Camer also testified that Drs. Sunde and Renfrow were negligent in performing the fourth-degree laceration repair.  Dr. Camer stated that a "lower level resident" like Dr. Renfrow should not have performed a laceration repair.  Dr. Camer based his opinion off Dr. Renfrow's notes and his review of the "literature." But Dr. Camer did not explain what "literature" he reviewed or how, if at all, Drs. Renfrow and Sunde deviated from it.  He did not explain what Drs. Renfrow and Sunde should have done differently or what the applicable standard of care would be as to a fourth-degree laceration repair.  Dr. Camer also incorrectly referred to Dr. Renfrow—who was a "senior resident" and nearly finished with her residency—as a "lower-level resident."  No other witness indicated that Dr. Renfrow had insufficient experience or skill to perform the fourth-degree laceration repair.

Notably, Woodman's other expert witness, Dr. Lefevre, testified that he believed based on his own experience and his own review of the medical records that

Dr. Renfrow performed the fourth-degree laceration repair correctly. He opined that he believed Woodman "got good care from the delivery up to" the primary rectovaginal fistula repair on March 24, 2015. Dr. Lefevre did not opine more specifically about what the standard of care would be as to the fourth-degree laceration repair. Since the court gives Dr. Camer's opinion no weight and since Dr. Lefevre did not opine about the standard of care beyond stating that the fourth-degree laceration repair was performed properly, Woodman has not presented credible expert testimony to establish any standard of care as to the fourth-degree laceration repair.

C. <u>Primary fistula repair as complication from fourth-degree perineal laceration</u>

The court received thorough and in-depth testimony from several witnesses about the standard of care for performing a primary fistula repair that occurs as a complication to a fourth-degree perineal laceration. This testimony about the standard of care included the training and experience necessary to perform a primary fistula repair in these circumstances, the custom of several medical facilities about who can perform a primary fistula repair in these circumstances, and the medical technique and judgment necessary to perform a primary fistula repair with the expected chance of success (more than 90 percent, at the very least) in these circumstances. In short, this evidence established that the standard of care for a rectovaginal fistula repair calls for a qualified surgeon to perform the repair consistent with general surgical principles and settled fistula repair technique.

1.    <u>Training and experience that qualifies a surgeon to perform a
primary fistula repair as a complication to a fourth-degree
laceration</u>

Dr. Lefevre opined that the standard of care at a tertiary medical facility[14]
like Madigan calls for a treating physician to consult with an available
board-certified subspecialist when repairing or analyzing complications from a
medical procedure.  And specifically for a rectovaginal fistula, Dr. Lefevre opined
that the treating physician should consult with a board-certified urogynecologist
when that fistula arises as a complication from a fourth-degree perineal laceration.
In support, Dr. Lefevre testified that urogynecologists have specific training in
understanding the anatomy of the vagina and the nuances of a vaginal fistula's
location, such as whether it is a rectovaginal fistula or anovaginal fistula.  Dr.
Lefevre asserted that experience performing rectovaginal fistula repairs alone is not
as important as urogynecology training.  In particular, in Dr. Lefevre's view,
urogynecology training improves a surgeon's judgment about when the patient's
tissue is in an optimal condition to perform the rectovaginal fistula repair.

In contrast, Dr. Culligan opined that an OBGYN generalist who has trained
at a time when rectovaginal fistulas were more common than today and whose day-
to-day practice includes covering a labor and delivery floor at a medical facility
would necessarily have sufficient experience and expertise to perform a rectovaginal

---

[14] A tertiary medical facility is generally a large medical facility that provides
care from subspecialists (e.g., urogynecologists and gynecologist-oncologists).  A
tertiary care facility usually has access to large blood banks and intensive care units.
Tertiary care facilities are also usually teaching hospitals.

fistula repair.  Similarly, Dr. Sunde testified that it would be unusual for a physician trained as a gynecologist-oncologist, which is itself an OBGYN subspecialty, to always refer a rectovaginal fistula repair to a urogynecologist, although he acknowledged that an OBGYN generalist might do so depending on the circumstances and the particular physician's experience.  Dr. Vaccaro added that older OBGYNs such as Dr. Sunde were trained in urogynecology surgeries such as fistula repair as part of their OBGYN specialist training.

On this limited issue, the court finds Dr. Culligan's opinion more persuasive than Dr. Lefevre's opinion.  While Dr. Lefevre's explanation that urogynecologists receive specific training on the vaginal anatomy is sensible, the evidence showed that some OBGYN generalists (or other OBGYN subspecialists) received training at a time when it incorporated urogynecology.  In addition, the court is not persuaded that a physician who has training on how to perform rectovaginal fistula repairs (and has performed many successful rectovaginal fistula repairs) is necessarily unqualified to perform them because he or she lacks a particular board certification.

The practice bulletins issued by medical governing organizations support this conclusion.  Specifically, the relevant bulletins state that any physician with experience in pelvic surgery and familiarity with fistula repair techniques can perform a rectovaginal fistula repair.  And although Dr. Lefevre testified that the custom of his hospital in Massachusetts is to refer all rectovaginal fistula repairs to urogynecologists, that was not the custom at Madigan nor is it the custom of any facility at which the other testifying physicians worked.  For example, Dr. Sunde

testified that it is not the practice at Baylor College of Medicine, where he is currently employed; Dr. Vaccaro testified that it is not the custom at her current employer, Walter Reed Medical Center; and Dr. Lewis testified that it was likewise not the custom at her employer, Indiana University Ball Memorial Hospital nor at her prior employers including the Atlantic Medical Health System in New Jersey. Besides his own, Dr. Lefevre did not testify about whether he knows about any other hospital that refers all rectovaginal fistula cases to urogynecologists. Instead, most medical facilities evaluate the qualifications of surgeons during the credentialing process on an individual, case-by-case basis to determine whether that particular surgeon has the requisite skills and experience to perform a rectovaginal fistula repair.

Finally, Dr. Vaccaro's statement that, after the third failed repair, Woodman should only be seen by a urogynecologist does not support Dr. Lefevre's opinion because Dr. Vaccaro limited her recommendation to repairs made after the primary repair fails. Similarly, Dr. Culligan testified that, after multiple failed repairs, a patient should be seen by a physician who has experience successfully correcting fistulas after multiple failed attempts—possibly but not necessarily a urogynecologist. Dr. Lefevre himself clarified that a colorectal surgeon could be qualified to perform a rectovaginal fistula repair after multiple failed attempts. And, in this case Woodman saw both a colorectal surgeon and urogynecologists after the primary repair failed. These different subspecialists had different approaches

to correct the persistent fistula, and this diversity of skill and experience in attempting to fix a difficult problem was ultimately to Woodman's benefit.

Weighing all this evidence together, the court concludes that the standard of care under these circumstances does not require referral of a primary rectovaginal fistula repair to a urogynecologist. Rather, given the testimony of both experts and the treating physicians about the nature of a rectovaginal fistula repair and the evidence and testimony about medical training, medical guidance from ACOG, and the customs of medical facilities, the standard of care calls for a rectovaginal fistula repair to be supervised or performed by a physician who is: (1) credentialed to perform the repair by the medical facility; (2) has training in pelvic and vaginal surgical techniques and anatomy; and (3) has demonstrated experience in performing successful rectovaginal fistula repairs. If a resident performs the surgery, the supervising attending physician should meet those criteria and use his judgment about whether the timing for the surgery is appropriate. An attending physician who does not meet those criteria can meet the standard of care by consulting with or referring the patient to a physician who does.

2.      The standard of care calls for performing the primary rectovaginal fistula repair consistent with general surgical principles and fistula repair techniques.

In addition to discussing the standard of care as to who can perform a primary rectovaginal fistula repair, Drs. Lefevre and Culligan, as well as the treating physicians, discussed the surgical principles and medical techniques and

judgments that are necessary to perform a rectovaginal fistula repair in a way that gives the patient the best chance of success.  For the reasons that follow, Dr. Lefevre's opinion on this issue was the most persuasive.

The standard of care in performing a primary rectovaginal fistula repair calls for the surgery to be performed in conformity with the general surgical principles, described above, that have been shown to provide the patient with the chance of a successful outcome that is typical for the surgery, which is near to 100 percent. These principles include performing the surgery using the correct suturing technique and appropriate suture material considering the involved tissue.

More pertinent to this case, a primary repair of a rectovaginal fistula like Woodman's must be performed at a time appropriate to allow the surgeon to create multiple—at least four—imbricating layers of tissue.  Dr. Lefevre testified that this is the minimum number of imbricating layers necessary to provide the patient with the chance of success that is typical of the surgery.  Dr. Culligan agreed with the proposition that surgeons should create as many imbricating layers as they can, although he did not specify a minimum number to maximize the likelihood of a successful surgery.

The condition of the patient's tissue allows or prevents the requisite number of imbricating layers to be created.  Both Drs. Lefevre and Culligan testified to the importance of correct timing, which can vary from patient to patient, and obtaining "good" tissue to perform a repair with the highest chance of success.  Likewise, Dr. Renfrow testified that the number of imbricating layers that can be created depends

40

on the amount of tissue available for the repair.  The standard of care under non-emergency circumstances such as in this case calls for the surgeons to delay the surgery until the patient's tissue is optimal and allows the surgeon to create at least four imbricating layers of tissue during the repair.

The court found unpersuasive Dr. Renfrow's testimony that two imbricating layers are sufficient given a relatively small fistula like Woodman's fistula.  Dr. Renfrow's opinion was that more layers might introduce too much foreign material to the body or create too much tension on the tissue.  The court, however, credits Dr. Lefevre's testimony over Dr. Renfrow's testimony because of Dr. Lefevre's vast experience in the urogynecology subspecialty.  Dr. Lefevre's testimony was also logical, consistent with medical record evidence, and consistent with the practice of the other physicians in this case.  For example, Drs. Lewis and Vaccaro created at least four imbricating layers in repairing the same-sized fistula during their respective repair attempts.

**Medical Malpractice Legal Standards**

Woodman brings one claim for medical malpractice and Mark Foley brings one claim for loss of consortium.  Both claims are against the United States.  The FTCA vests the district courts with exclusive jurisdiction to hear "civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his

office or employment . . . ." 28 U.S.C. § 1346(b)(1).  There is no dispute in this case that the medical providers who treated Woodman at Madigan were federal employees acting within the scope of their employment.

Medical malpractice under Washington law requires plaintiffs to demonstrate by a preponderance of the evidence that they suffered an injury that resulted from the failure of a medical provider to follow the accepted standard of care.  Wash. Rev. Code Ann. ("RCW") 7.70.030(1).  Specifically, the plaintiff must prove two elements: (1) the medical provider "failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances" and (2) the medical provider's failure to follow the standard of care proximately caused the plaintiff's injury.  RCW 7.70.040; Keck v. Collins, 184 Wash.2d 358, 371 (2015).  "To sustain a verdict, [the plaintiff] needs an expert to say what a reasonable doctor would or would not have done, that the [treating providers] failed to act in that manner, and that this failure caused her injuries."  Keck, 184 Wash.2d at 371.

Showing proximate cause requires establishing that the breach was both the "cause in fact" and the "legal cause" of the injury.  Dunnington v. Virginia Mason Med. Ctr., 187 Wash.2d 629, 636 (2017).  "Cause in fact refers to the 'but for' consequences of an act—the physical connection between an act and an injury."  Id. "The 'but for' test requires a plaintiff to establish that the act complained of probably caused the subsequent" injury and without the act the injury probably

42

would not have happened.  Daugert v. Pappas, 104 Wash.2d 254, 260 (1985); Hill, 143 Wash. App. 438 at 448.  "Legal cause" refers to "how far the consequences of a defendant's acts should extend."  Lowman v. Wilbur, 178 Wash.2d 165, 169 (2013). "Legal causation is grounded in policy determinations," and, to decide whether a defendant's breach of a duty is too remote or insubstantial to trigger liability, the court looks to "mixed considerations of logic, common sense, justice, policy, and precedent."  Id.

## Rulings of Law

I.  <u>Woodman has proved negligence as to the primary rectovaginal fistula repair, but not as to her labor and delivery of James or the fourth-degree laceration repair.</u>

Woodman contends that she suffered injuries caused by Madigan's failure to follow the accepted standard of care.  The court finds that Woodman has <u>not</u> established by a preponderance of the evidence any medical malpractice as to James's delivery or the fourth-degree laceration repair.  However, Woodman has shown by a preponderance of the evidence that Madigan physicians breached the standard of care as to the primary rectovaginal fistula repair.  Woodman's subsequent injuries were proximately caused by that breach.  Mark Foley has also established loss of consortium damages resulting from that breach.  The court examines the merits of each of Woodman's theories below.

A.   <u>Woodman failed to demonstrate by a preponderance of the evidence that Madigan medical providers breached the standard of care as to her delivery of James Foley and the repair of her fourth-degree laceration.</u>

As to James's delivery, Woodman contends that Madigan physicians should have performed an episiotomy because it would have reduced the likelihood that she suffered a severe laceration.  Woodman's expert witness on this matter, Dr. Camer, testified that an episiotomy might have aided in avoiding the laceration.  But as discussed above, Dr. Camer's opinion that Woodman should have been provided an episiotomy to reduce the chance of a severe laceration was rejected by the physicians with experience in obstetrics and, consequently, by the court.  The standard of care under these circumstances did not call for the medical providers to provide Woodman with an episiotomy or discuss it as an option with her.  Therefore, the medical providers failure to do so did not breach the standard of care.

Next, Woodman failed to establish any standard of care as to the fourth-degree laceration repair, which occurred just after she gave birth.  As discussed above, Dr. Camer testified that Drs. Renfrow and Sunde performed that surgery improperly.  But Dr. Camer failed to explain what Drs. Renfrow and Sunde should have done differently—his testimony was, at best, conjecture that something might have gone wrong because the rectovaginal fistula subsequently developed.  Dr. Lefevre, however, testified that a rectovaginal fistula can result even from a correctly performed fourth-degree laceration repair.  The court does not find Dr. Camer's testimony about the standard of care for a fourth-degree perineal laceration repair persuasive and gives it no weight.  The court also does not credit

44

Dr. Camer's assertion that a senior resident in obstetrics cannot perform a fourth-degree laceration repair when supervised by a board-certified OBGYN who is credentialed to perform that repair, such as Dr. Sunde.

Because there is no credited testimony establishing the standard of care as to the repair of the fourth-degree laceration, the evidence is insufficient, as a matter of law, to establish that any medical malpractice occurred.  See Bell v. City of Lacey, No. C18-5918 BHS, 2021 WL 4476855, at *7 (W.D. Wash. Sept. 30, 2021) (applying Washington law and granting summary judgment on medical malpractice claim when plaintiff failed to establish any standard of care).  For these reasons, Woodman has not demonstrated that any negligence occurred during James's delivery or during the fourth-degree laceration repair.

B.    Woodman failed to demonstrate by a preponderance of the evidence that Madigan medical providers breached the standard of care by failing to refer the primary rectovaginal fistula repair to a board-certified urogynecologist.

Next, Woodman contends that Dr. Sunde breached the standard of care as to the rectovaginal fistula repair because he was not qualified to perform it.  Woodman asserts that only a board-certified urogynecologist is qualified to perform a rectovaginal fistula repair under these circumstances.  As discussed above, however, the standard of care in this situation calls for a primary rectovaginal fistula repair to be performed or supervised by a physician who is: (1) credentialed to perform the repair by the medical facility; (2) has training in pelvic and vaginal

surgical techniques and anatomy; and (3) has demonstrated experience in performing successful rectovaginal fistula repairs.

Dr. Sunde, who supervised the primary rectovaginal fistula repair, was credentialed by Madigan to perform rectovaginal fistula repairs.  He had training in pelvic and vaginal surgical techniques and anatomy through his OBGYN residency and his fellowship as a gynecologist-oncologist.  And Dr. Sunde had demonstrated experience in performing successful rectovaginal fistula repairs.  Specifically, he testified that he performed many rectovaginal fistula repairs over the years, and his colleagues described him as a highly skilled surgeon who generally has excellent patient outcomes.  Furthermore, during his testimony, Dr. Sunde demonstrated familiarity with the surgery for repairing a rectovaginal fistula and his understanding of the method of performing the surgery was consistent with Drs. Lefevre's and Culligan's.  Finally, although Dr. Renfrow actually performed the surgery, she was supervised by Dr. Sunde who testified that he directed her on how to perform the surgery.

For these reasons, the court finds that Drs. Sunde and Renfrow did not breach the standard of care by failing to refer the primary rectovaginal fistula repair to a urogynecologist.

C.   Madigan medical providers breached the standard of care by failing to perform the primary rectovaginal fistula repair to accepted medical standards.

Lastly, Woodman contends that Drs. Sunde and Renfrow failed to perform the primary rectovaginal fistula repair on March 24, 2015—about 9 weeks after she gave birth—to accepted medical standards, which constitutes a breach of the standard of care. The standard of care for a primary repair of a fistula like Woodman's fistula is to follow the known surgical principles. Specifically, the surgeon must use appropriate technique and surgical material (i.e., sutures). A surgeon may only perform the surgery if an appropriate time has passed since childbirth to allow the surgeon to create at least four imbricating layers of tissue in the fistula tract. When the standard of care is followed, nearly all primary rectovaginal fistula repairs succeed.

In short, had Dr. Sunde followed the standard of care as outlined above, he would have delayed the surgery because Woodman's tissue was not in a condition to provide the best chance at successful healing. Critically, Woodman's tissue was not in a condition to allow Dr. Renfrow to create at least four imbricating layers of tissue. A delay would have ensured that any inflammation or irritation of tissue subsided before they attempted the repair. This would have provided Woodman with the expected chance at successful recovery, which is nearly 100 percent. Given the success rate of rectovaginal fistula repairs performed to the standard of care, a delayed primary repair with at least four imbricating layers would, more likely than not, have succeeded.

47

1.      <u>Madigan's medical providers failed to adhere to the standard of care because the repair was performed with only two imbricating layers.</u>

Dr. Renfrow, who was directed in the surgery by Dr. Sunde, created only two imbricating layers of tissue after removing the fistula tract on March 24, 2015.  As discussed above, the standard of care in Washington for a primary rectovaginal fistula similar to Woodman's fistula calls for creating at least four imbricating layers of tissue.  The reason why Drs. Renfrow and Sunde only created two layers of imbricating tissue is uncertain.  Dr. Renfrow testified that additional layers could cause unnecessary tension on the repair site, indicating that the decision to only create two imbricating layers was by design, but Dr. Sunde testified that multiple imbricating layers are preferable and did not suggest that he felt more layers would have been inappropriate.

The court credits Dr. Lefevre's explanation that it is more likely than not that the repair failed because of the condition of Woodman's tissue.  Specifically, Dr. Lefevre opined that Woodman's tissue was not of sufficient operable quality on March 24, 2015, to allow a repair to be made with enough imbricating layers.  Dr. Lefevre testified that Dr. Renfrow would more likely have been able to create at least four imbricating layers if Drs. Sunde and Renfrow had properly judged the quality of Woodman's tissue and delayed the surgery.  Dr. Lefevre based his assertion that the tissue was not of sufficient quality to allow at least four imbricating layers to be created on March 24, 2015, because of Woodman's extreme

pain.  Woodman's pain was unusual because a fistula normally does not cause pain.

Dr. Lefevre also observed that the close timing of the repair to Woodman's delivery

and the fact that she was breastfeeding supported his conclusion that Woodman's

tissue was not in a condition for a successful repair of the rectovaginal fistula.

Thus, the additional factors that extend the generally applicable time period for

performing a rectovaginal fistula repair were applicable in these circumstances.

Accordingly, Dr. Sunde should have delayed Woodman's surgery until her tissue

was of suitable condition to allow Dr. Renfrow to create at least four imbricating

layers of tissue during the first repair attempt.  Alternatively, if Woodman's tissue

was in a condition to allow at least four imbricating layers to be created, Dr. Sunde

should have ensured that Dr. Renfrow created at least that many imbricating

layers.

> 2.      The failure to perform the surgery with four imbricating layers
> is the proximate cause of its failure and the failure of
> subsequent surgeries.

The failure to perform the primary rectovaginal fistula repair to the standard

of care is, more likely than not, what caused the repair to fail.  As noted above,

under Washington law, the two aspects of proximate cause are cause in fact and

legal cause.  Dunnington, 187 Wash.2d at 636.  As to cause in fact (also known as

but-for causation), Dr. Lefevre's testimony about the likely reason for the repair's

failure was the most persuasive.  Specifically, Dr. Lefevre testified that at least four

imbricating layers of sutured tissue would have been necessary to achieve the

highest likelihood of success.  Dr. Lefevre explained that having at least four imbricating layers was necessary for strength of the repair because of the natural, unavoidable forces that occur in the rectum and lower pelvis.  Since the repair was performed with only two imbricating layers, it was not strong enough to withstand those forces and broke down.

And, although Dr. Culligan did not testify that the cause of the repair's failure was the number of imbricating layers or the timing of the surgery, he observed that the primary repair was undertaken on the early side of the generally permissible time period.  Like Dr. Lefevre, Dr. Culligan testified that breastfeeding is a factor that could warrant waiting beyond the typical 6-to-12-week post-childbirth time period to achieve the most optimal tissue for the repair.  Moreover, Dr. Culligan surmised that "bad" tissue could have been the cause of the primary repair's failure, although he deferred to Dr. Sunde's judgment.  Ultimately, Dr. Culligan did not commit to a cause.  Rather, he concluded that the cause of the failure was a "mystery."  The court finds Dr. Lefevre's conclusion more persuasive, particularly because there was no dispute between Drs. Lefevre and Culligan about these factors being critical in terms of whether a rectovaginal fistula repair is successful.

The failure to perform the primary rectovaginal fistula repair to the standard of care was also the cause in fact of the failure of the subsequent surgeries and the consequences to Woodman.  Both Drs. Lefevre and Culligan testified that the failure of the primary repair greatly decreased the likelihood of any subsequent

surgery being successful.  There was no argument that any of the subsequent repair attempts were performed negligently or that Woodman did anything that would cause the subsequent repair attempts to become materially more likely to fail than they already were because of the failed primary repair.  There was no evidence that any of the subsequent repair attempts were unnecessary or unreasonable.[15]

Lastly, the failure to perform the primary rectovaginal fistula repair to the standard of care is the legal cause of Woodman's injuries. There are no policy reasons, issues of logic, common sense, justice, policy, or precedent indicating that liability should not attach in this case.  The injuries to Woodman were foreseeable and flow directly from the breach of the standard of care that occurred in this case such that they are not too remote to warrant imposition of liability.  In addition, the discussion above as to the standard of care and the existence of Washington's medical malpractice statute show that the intended policy is for liability to attach under these circumstances.  See Lowman, 178 Wash.2d at 171 ("[T]he policy considerations that support imposition of a duty will often compel the recognition of legal causation, so long as cause-in-fact is established under the relevant facts.").

For the foregoing reasons, Woodman has demonstrated that the failure to perform the primary rectovaginal fistula repair was the proximate cause of her injuries.

---

[15] While the failed repair on June 28, 2016, performed by Dr. Vaccaro, occurred very soon after Dr. Lewis's failed repair of June 2, the evidence indicated that neither the June 2 nor the June 28 repairs were likely to succeed once the primary repair failed.

D.   Woodman's bowel regimen did not create or contribute to the development of the fistula or the failure of the primary repair.

The United States contends that Woodman's failure to adhere to a proper bowel regimen caused the fistula to develop and the primary rectovaginal fistula repair to fail.  A plaintiff's recovery can be diminished by her own failure to exercise reasonable care if that failure was a legally contributing cause of her injury. Dunnington, 187 Wash.2d at 637-38.  The United States's argument that Woodman was contributorily negligent, however, is unpersuasive.

First, as to the development of the fistula itself after the fourth-degree laceration repair, Woodman's examination on January 19, just a few days after the fourth-degree laceration repair, revealed that the repair was intact despite Woodman's pain and the alleged failure to take laxatives and stool softeners. Although Dr. Korzen was concerned about a fistula developing given Woodman's reports of pain and stool passing from her vagina, the examination did not uncover any developing fistulas.  Both Drs. Culligan and Lefevre testified that the tests Dr. Korzen performed would have uncovered any failure of the laceration repair at that time.  Furthermore, Dr. Lefevre testified that, in terms of whether a laceration repair fails or develops complications, properly performing the surgery is more important than the nature of the patient's bowel movements.

Indeed, Woodman was healing well through January and February 2015. Woodman's fistula only became apparent in March 2015, when Woodman's condition, which had been steadily improving since January, suddenly and

drastically worsened after having diarrhea.  But laxatives and stool softeners would not have helped Woodman avoid diarrhea, and the United States does not (and could not in good faith given the evidence presented) argue that Woodman's food poisoning was caused by a lack of reasonable care.

Furthermore, although Woodman may not have always taken all the laxatives and stool softeners in the strongest doses, patients are not advised to take any specific dosage.  Rather, patients are provided autonomy to adjust their personal dosage based on results because the effects of laxatives and stool softeners vary from person to person.  For example, Dr. Lefevre observed that laxatives are unhelpful for many patients because they cause many patients to have stools that are too soft or liquid.

And, here, Woodman testified that, while taking laxatives and stool softeners, her stools became very soft or even liquid.  Woodman's testimony about the nature of her stools is consistent with Dr. Lefevre's testimony, as he testified that leakage of stool from the vagina through a fourth-degree laceration repair or small fistula like the one she had would occur only if the stool was very soft or near liquid. Similarly, when Woodman discovered the rectovaginal fistula repair had broken down, she reported stool leaking from her vagina.  Hard stools would not pass from the rectum to the vagina through a small fistula, and Woodman testified that her stools before and after the first rectovaginal fistula repair were soft, not hard.

In sum, the court finds that Woodman demonstrated reasonable care in adjusting her dose of laxatives and stool softeners to attempt to achieve soft stools.

Furthermore, the evidence does not show that Woodman's dose of laxatives and stool softeners was a contributing cause to either the formation of the rectovaginal fistula or the failure to the primary rectovaginal fistula repair.

E.   The standards of care found in this case are the standards of care in the State of Washington.

In its supplemental post-trial brief, the United States faults Dr. Lefevre's opinion, which in general the court has given strong weight in determining the standards of care applicable in this case, because he "never attempted to determine the standard of care in the State of Washington."  Doc. no. 42 at 5.  The United States's argument is unpersuasive.

As the finder of fact in this case, the court is entitled to credit Dr. Lefevre's testimony about the extent and scope of the standard of care.  See Rodríguez-Valentin v. Doctors' Ctr. Hosp., 27 F.4th 14, 20-21 (1st Cir. 2022).  Here, Dr. Lefevre testified about the standard of care that he thought should be applicable to Madigan Army Medical Center, a medical facility that he knew is in Washington.  Therefore, the United States's contention that Dr. Lefevre "never attempted to determine the standard of care in the State of Washington" is incorrect.

Additionally, there was overwhelming evidence that the standard of care in Washington as to the medical issues in this case is the same at similarly sophisticated medical facilities throughout the United States.  Several physicians, such as Drs. Culligan, Sunde, Renfrow, Lewis, and Vaccaro, all of whom now practice in different medical facilities around the United States, spoke to the same

medical standards, procedures, and technique.  ABOG, ACOG, and AUGS, whose

publications and practice bulletins are relied on by both the United States and

Woodman, are national organizations whose guidance applies in Washington the

same as anywhere else.  No witness testified—including the government's own

expert witness, Dr. Culligan, whose practice is in New Jersey—about any reason

why the standard of care at a tertiary care medical facility in Washington is any

different than the standard of care at any other similar medical facility elsewhere in

the United States.  Therefore, a reasonable inference can be made that the standard

of care as to the medical treatment in this case is generally the same throughout the

United States when performed at a medical facility similar to Madigan.  See id.

(holding that a fact finder can credit an expert witness's assertion that, under the

circumstances of a particular case, the standard of care in one locality is the same

as the standard of care in the United States generally).[16]


II.     Mark Foley has established loss of consortium by a preponderance of the
        evidence.

        "Loss of consortium relates to the 'loss of love, affection, care, services,

companionship, society and consortium" from one's spouse because of an injury to

the spouse.  Lund v. Caple, 100 Wash.2d 739, 744 (1984).  To show loss of

---

[16] Because the court only heard expert testimony about what the standard of care would be at a tertiary care facility similar to Madigan, the court limits its findings about the standard of care to such facilities.  Beyond the availability of subspecialists, however, there is no reason to believe that the standard of care found in this case would be different at a smaller facility.

consortium, the plaintiff must show a separate and direct injury to his or her

spouse.  Id. at 743 ("[A]n element of loss of consortium is a separate, direct injury to

a spouse[.]").  As discussed above, Woodman has demonstrated that the negligent

acts of medical providers employed by the United States caused her to suffer an

injury.  Foley has demonstrated that Woodman's injuries caused him to lose the

love, affection, care, et cetera, from Woodman, who was at the time his spouse.

Accordingly, Foley has established a separate claim for loss of consortium.


## Other Findings

I.   <u>Woodman failed to administratively exhaust her claim for failure to obtain</u>
     <u>informed consent.</u>

     During trial and in her post-trial briefing, Woodman asserted that she was

entitled to damages based on the medical providers' failure to obtain her informed

consent for the rectovaginal fistula repair.  See RCW 7.70.050(1).  The United

States argues that the court lacks jurisdiction to consider Woodman's claim for

failure to secure informed consent.

     Under the FTCA, a putative plaintiff must administratively exhaust claims

before bringing them in court.  See 28 U.S.C. § 2675(a) (barring plaintiff from

bringing claim "unless the claimant shall have first presented the claim to the

appropriate Federal agency and his [or her] claim shall have been finally denied by

the agency in writing and sent by certified or registered mail"); McNeil v. United

States, 508 U.S. 106, 113 (1993).  Since the FTCA is a waiver of the United States's

sovereign immunity, the failure to meet all requirements of that waiver renders the

court without subject matter jurisdiction.  See Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 40-41 (1st Cir. 2000).   In evaluating whether § 2675(a)'s notice requirement has been met, the court asks whether "the language of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought."  Id. at 40; Murrey v. United States, 73 F.3d 1448, 1453 (7th Cir. 1996) (holding that "the administrative claim must narrate facts from which a legally trained reader would infer a failure to obtain informed consent").

Under Washington law, the failure to secure informed consent is considered a claim distinct from medical malpractice.  Gustav v. Seattle Urological Assocs., 90 Wash. App. 785, 789 (1998) (stating that negligence and lack of informed consent are "distinct causes of action" and "[a]llegations supporting one normally will not support the other").  The elements of failure to secure informed consent are distinct from the elements for medical malpractice.  Compare RCW 7.70.50(1) (failure to secure informed consent elements), with RCW 7.70.030 (elements of medical malpractice).

Here, Woodman only presented to the United States Army a claim based factually and legally on medical malpractice.  See doc. no. 42-1 at 1-2.  Specifically, on the standard form[17] she used to provide notice of her claim to the United States Army, Woodman did not assert that failure to obtain informed consent was a

_____

[17] Woodman's counsel used an SF-95 form to describe the nature of her claims to the United States Army.  See generally 28 C.F.R. § 14.2(a) (explaining the use of Standard Form 95 in noticing claims to agencies).

potential ground for recovery, and there is no mention of the consent process that

occurred in this case in the factual narrative.  Id.  Nothing provided to the United

States Army suggests that there was a question about informed consent in this

case.  Thus, Woodman's claim to the United States Army for medical negligence did

not provide information to the United States Army sufficient to give notice that it

should investigate whether there was a failure to secure informed consent.  See

Dynamic Image Techs., Inc., 221 F.3d at 40-41.

For these reasons, Woodman failed to satisfy § 2675(a)'s notice requirement.

Woodman's claim for failure to obtain informed consent is therefore dismissed for

lack of subject matter jurisdiction.  See, e.g., Cepeda v. United States, No. 19 CIV

5967 (JPC), 2021 WL 465409, at *7-8 (S.D.N.Y. Feb. 9, 2021) (dismissing claim for

failure to obtain informed consent that was not presented in SF-95 but allowing

claim for medical malpractice that was presented in SF-95 to move forward);

Godinez-Torres v. United States, No. 14CV1097CBAPK, 2016 WL 11670284, at *4

(E.D.N.Y. Mar. 31, 2016) (same).


II.    The loss of chance doctrine does not apply to the circumstances of this case.

The Washington "loss of chance" doctrine, raised at one point by Woodman

and then apparently withdrawn post-trial, see doc. no. 40 at 6-8, does not apply

under the circumstances of this case.  In a "loss of chance" case, the threshold for

demonstrating causation is effectively reduced by reimagining the plaintiff's injury

as the loss of chance to avoid some harm.  See Dunnington, 187 Wash.2d at 637.  In

a medical malpractice case, however, the loss-of-chance theory is only available in limited circumstances when a medical provider's breach diminished the plaintiff's likelihood of avoiding an injury that was likely to occur on its own even without negligence.  See id. ("A key distinction of loss of chance cases is that regardless of the negligence, the ultimate injury is likely to occur."); Herskovits v. Group Health Coop of Puget Sound, 99 Wash.2d 609, 614-15 (1983).  Essentially, in a loss of chance case, the relevant injury for purposes of causation becomes the loss of the chance to avoid some other ultimate harm that befell the plaintiff (typically— though not necessarily—death), such that the medical provider's breach caused an injury even if it did not cause the ultimate harm the plaintiff suffered.  See Mohr v. Grantham, 172 Wash.2d 844, 857-58 (2011); Estate of Dormaier ex rel. Dormaier v. Columbia Basin Anesthesia, P.L.L.C., 177 Wash. App. 828, 868-870 (2013).

Here, as discussed above, the rectovaginal fistula repair, in the absence of negligence, was very unlikely to fail.  Drs. Culligan and Lefevre testified that a rectovaginal fistula repair performed to the standard of care has a near 100 percent chance of success.  As the court found, the breach of the standard of care as to the primary rectovaginal fistula repair was, more likely than not, the proximate cause of its failure as well as the failures of the subsequent rectovaginal fistula surgeries. Woodman suffered a number of injuries as a direct result of the failure of these surgeries.  Accordingly, the loss of chance doctrine does not apply in this case.

III.    <u>The United States waived its untimely evidentiary challenge to Dr. Lefevre's</u>
       <u>testimony.</u>

In its response to the court's directive to file supplemental briefs on damages,

the United States expanded the matter to include a challenge to Dr. Lefevre's

testimony under Federal Rule of Civil Procedure 26(a)(2)(B).  Doc. no. 42 at 4 ("Dr.

Lefevre's trial testimony . . . ran afoul of Fed. R. Civ. P. 26(a)(2)(B) because his

testimony involving <u>tertiary medical institutions</u> was never mentioned in his expert

opinion report . . . supplemental expert opinion report . . . , or deposition (DE 98).");

id. at 5 ("Dr. Lefevre's expert opinion also failed to identify 'data or other

information considered in forming [his] opinion[.]'"), id. at 8-10.  Specifically, the

United States argues that Dr. Lefevre's expert report did not mention that his

opinion about the standard of care was limited to "tertiary medical institutions,"

i.e., institutions that employ subspecialists such as urogynecologists.  The United

States also takes issue with Dr. Lefevre's testimony about whether Dr. Sunde

should have waited longer before performing Woodman's rectovaginal fistula repair.

Under Rule 26(a)(2)(B), an expert witness must prepare a "written report"

that contains, <u>inter</u> <u>alia</u>, a "complete statement of all opinions the witness will

express and the basis and reasons for them" and "the facts or data considered by the

witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B).  "If a party fails to provide

information or identify a witness as required by Rule 26(a) . . . , the party is not

allowed to use that information or witness to supply evidence on a motion, at a

hearing, or at a trial, unless the failure was substantially justified or is harmless."

Fed. R. Civ. P. 37(c)(1).  "In addition to or instead of this sanction, the court, on

motion and after giving an opportunity to be heard," may order payment of reasonable expenses, including attorney fees, caused by the failure; may inform the jury of the party's failure; and may impose other sanctions.  Id.  The United States's request to exclude Dr. Lefevre's testimony fails for three reasons: it did not timely object to the testimony; Dr. Lefevre's testimony did not go beyond the scope of his expert report; and even if the testimony did go beyond the scope of his expert report, any violation of Rule 26(a)(2)(B) was harmless.

First, the United States did not object during trial to the parts of Dr. Lefevre's testimony that it contends went beyond the scope of his expert report. Instead, it inserted the matter into post-trial briefing requested by the court on an entirely different subject matter.  The failure to raise an objection to the admissibility of evidence at the appropriate time during trial waives that objection. See United States v. Beras, 183 F.3d 22, 27 n.3 (1st Cir. 1999); Reagan v. Brock, 628 F.2d 721, 723-24 (1st Cir. 1980).  Here, the United States could have objected when it thought Dr. Lefevre's testimony during trial went beyond his expert report.  The United States failed to do so.  Its attempt to raise the objection alongside to the damages issues about which the court requested briefing does not resuscitate it.

Second, no Rule 26(a) violation occurred because the challenged testimony merely narrowed Dr. Lefevre's opinion as disclosed in his expert report.  Consistent with settled law on defining the standard of care, Dr. Lefevre's expert report discussed the standard of care applicable to Madigan, which is a tertiary care facility.  Dr. Lefevre explained during trial that his opinion about the standard of

care vis-à-vis referring cases to urogynecologists was applicable to medical facilities like Madigan and not necessarily to medical facilities where subspecialty care is unavailable.  Specifically, he stated: "Madigan is a tertiary care center, which means . . . it provides subspecialty care. . . . [I]n that setting . . . the standard of care is when you have a complication . . . you have to involve your subspecialist."  Indeed, Woodman made clear prior to trial that her theory that Dr. Sunde should have referred her rectovaginal fistula surgery to a urogynecologist was contingent on a urogynecologist's availability.  See doc. no. 23 at 3 (Woodman pretrial statement).  Likewise, Dr. Lefevre's opinion that Dr. Sunde should have waited longer before the surgery was part of his opinion that Dr. Sunde should have consulted a urogynecologist before proceeding with the surgery.

Third, any violation of Rule 26(a) was harmless.  Dr. Lefevre's testimony about tertiary medical centers was relevant only to his opinion about whether Dr. Sunde should have referred Woodman's fistula repair to a urogynecologist.  The court, however, has not found that Dr. Sunde breached the standard of care by failing to refer Woodman's primary fistula repair to a urogynecologist.

And there was no serious dispute in this case that the standard of care can be different between a tertiary care facility like Madigan and a smaller facility.  In addition to Dr. Lefevre, Dr. Renfrow testified that the standard of care can vary between tertiary care facilities and other facilities.  Specifically, Dr. Renfrow testified that the "standard of care is going to be different at a tertiary center where

you have access to a huge blood bank and ICUs and many services versus a small, rural hospital [where] you can't deliver the same level of care."[18]

Lastly, as to the delay in performing the surgery, Dr. Lefevre and the United States's expert Dr. Culligan testified to the same factors that would counsel in favor of delaying the surgery.  Indeed, prior to Dr. Lefevre's testimony during trial, Dr. Culligan discussed what the appropriate time frame would have been for Drs. Sunde and Renfrow to perform the fistula repair.  Thus, the United States was able to effectively respond to Dr. Lefevre's opinion in that regard.  For those reasons, even if any violation of Rule 26(a) occurred as to Dr. Lefevre's expert report, no sanction is warranted.

IV.   Woodman's testimony was credible.

During trial, the United States challenged Woodman's credibility.  One of the government's main arguments at trial was that Woodman cannot meet her burden of proof because she is not credible.  After hearing and evaluating all the testimony and considering the admitted evidence, the court found Woodman's testimony credible.  Because the United States made Woodman's lack of credibility so much a part of its theory of the case, the court summarizes its findings with respect to some of the government's specific attacks here.

---

[18] As noted above, as to the standard of care found in this case, there is no reason to believe that the standard of care would have been different if Woodman had received treatment at a smaller facility.

First, the United States made much of Woodman's testimony that Madigan falsified records about whether her first post-partum visit to the Madigan triage center occurred on January 18 or January 19.  While the court has found that January 19 was, more likely than not, the date that the visit occurred, this finding does not discredit or undercut Woodman's testimony in whole.  Rather, Woodman's memory about this specific issue was not as strong as it was about other events. There is no indication or evidence that Woodman lied about what day she believed the appointment to have occurred.  Her mother-in-law, Diane Foley, also recalled the visit occurring on January 18.  Moreover, Woodman's belief that Madigan medical providers falsified the medical record showing the January 19 date was driven by her understandable distrust of Madigan medical providers after years of suffering.

The United States's other arguments about why the court should doubt Woodman's credibility also lack merit.  For example, the United States cross-examined Woodman about whether she had accurately reported on a medical form the number of miscarriages she had suffered in the past.  Woodman clarified that she did not think that one of the "miscarriages" she had suffered was in fact a miscarriage (she characterized it as a late period), but the physician she was seeing at the time insisted that it was a miscarriage and required her to add it to the medical form.  Woodman wanted the number of miscarriages reported on the form to be accurate.  Her testimony about her disagreement with the physician about the number of her miscarriages was understandable and credible.

64

Finally, the United States made much of the fact that Woodman could have caused the fistula repair to fail because of her failure to take the MiraLAX. The government argued that her "hard stool" was caused by her failure to take MiraLAX as the doctors prescribed. The problem with the government's theory is that it did not square with the medical records, which showed that Woodman's stools were soft during the time when the fistula likely developed. Moreover, the theory did not account for Woodman's credible explanation about the physician's inaccurate use of the word "hard" in the relevant medical note to describe Woodman's reports about her stools. As Woodman testified, she described the process of going to the bathroom as "hard." Woodman's testimony on this point was credible and the medical evidence supported her testimony.

In short, the United States's attacks on Woodman's credibility fell well short of the mark.

## Damages

Having found that Woodman and Foley have established their respective negligence and loss of consortium claims, the court turns to the amount of damages to which they are entitled.

I.    Economic Damages

During trial, Woodman did not claim or present evidence to support economic damages for medical malpractice. Accordingly, the court finds that Woodman is not entitled to any economic damages.

II.     Noneconomic Damages

Woodman and Foley request noneconomic damages.  See RCW 4.56.250(b).
Specifically, Woodman asks for an award of $9,000,000.  Foley asks for an award of
$1,100,000 for loss of consortium.

Noneconomic damages are subjective losses which include "physical pain and
mental suffering, disability, disfigurement, and loss of enjoyment of life, past and
future."  Johnson v. United States, No. C20-5581 MJP, 2021 WL 5998028, at *7
(W.D. Wash. Dec. 19, 2021).  Disability includes the impairment of the injured
person's ability to lead a normal life.  See Parris v. Johnson, 3 Wash. App. 853, 859-
60 (1970); Kirk v. Wash. State Univ., 109 Wash. 2d 448, 461-62 (1987).  Loss of
consortium damages are noneconomic damages.  RCW 4.56.250(b).  Calculating
noneconomic damages is generally left to the trier of fact.  See e.g., Bingaman v.
Grays Harbor Cmty. Hosp., 103 Wash. 2d 831, 835 (1985).

Woodman did not establish any negligence relative to her labor and delivery
in January 2015 or the fourth-degree laceration repair, so the court does not
consider damages until after the failed primary rectovaginal fistula repair on March
24, 2015.  The court considers noneconomic damages from after the failed repair of
March 24, 2015, to the successful repair and reversal of Woodman's ileostomy on
March 21, 2018, and July 24, 2018.

During this three-plus-year period, the evidence was undisputed that
Woodman endured considerable physical pain.  Specifically, Woodman testified that

fecal matter constantly seeped through the fistula and out of her vagina, which caused severe irritation and pain.  Because of the irritation from the fecal matter, Woodman suffered severe pain when trying to walk.  Woodman testified that she had to take baths with Epsom salts to relieve the pain and allow her to clean the fecal matter from her vagina.

Woodman also endured mental suffering and anguish due to the recurring physical pain and the embarrassment of being a young woman suffering from urinary incontinence and fecal matter seeping from her vagina.  She testified that she had to wear a diaper almost all the time.  She was unable to take care of herself without great difficulty, and she had to attempt to do so while taking care of a baby at the same time.  Woodman's ability to enjoy normal life was substantially diminished.

Woodman and her husband, Mark Foley, were unable to have sexual intercourse.  Woodman testified that she experienced "nothing but pain."  Woodman and Foley were unable to socialize with friends or do any of the things that they had previously enjoyed doing as a married couple.  For example, Woodman and Foley had been avid hikers, but Woodman was unable to walk without considerable pain.  Woodman had to wear diapers or bring a change of clothes everywhere she went because of incontinence, so travel became a chore.  Woodman also became increasingly depressed as the repairs continued to fail.  She testified that she felt like at times that she wanted "to give up on life" and that she questioned why she was "here."  As noted, Mark Foley testified that he became more like Woodman's

67

nursing assistant than her husband.  Eventually, these difficulties, which were at root caused by the failure of the primary fistula repair, led to the breakdown of the marriage.

In sum, during this time, few semblances of a normal life were available to Woodman.  Likewise, Foley was deprived of consortium during this time both due to Woodman's physical injuries and her mental and emotional injuries which led to the breakdown of their marriage.

Moreover, due to the failure of the primary rectovaginal fistula repair, Woodman underwent multiple additional surgeries with a low chance of success. These surgeries included an ileostomy, which involves bringing a part of the intestine outside the skin and sewing it to the abdomen so that fecal matter can empty into a bag rather than through the rectum.  More likely than not, Woodman could have avoided the ileostomy if the primary fistula repair had been performed to the standard of care.  The discomfort and embarrassment to a person caused by an ileostomy makes it a last resort option in treating a rectovaginal fistula.  Indeed, the experts and treating physicians agreed that an ileostomy should be recommended only when all other treatment options had been exhausted.  And, in this case, the evidence established that the ileostomy caused Woodman considerable distress.[19]

---

[19] Describing the ileostomy as a "blessing and a curse," Woodman testified that it relieved much of her physical pain.  Though her physical pain lessened, Woodman's mental suffering increased after the ileostomy.

In addition to the noneconomic damages between late March 2015 and the successful repair in July 2018, the court considers noneconomic damages resulting from Woodman's several ongoing and permanent injuries.  These permanent injuries, all consequent to the primary rectovaginal fistula repair failure, include scarring, disfigurement of Woodman's upper thigh, buttock, and vagina, and recurring and likely lifelong incontinence.  Woodman also faces the potential of additional surgeries to address recurring incontinence.  In addition, the breakdown of Woodman and Foley's marriage and eventual divorce is, more likely than not, a consequence of the failed primary rectovaginal fistula repair.  The loss of that relationship is a permanent, ongoing injury for both of them.

Finally, the court has carefully evaluated the comparative verdicts offered by both Woodman and the United States.  See doc. nos. 40, 42.  In Washington and other states that do not place a limit on noneconomic damages such as pain and suffering and loss of consortium,[20] verdicts vary greatly between cases.  Thus, the comparative verdicts offered by both Woodman and the United States were of limited value to the court's analysis.  Additionally, the court has evaluated older verdicts, such as several of those offered by the United States, with respect to inflation and the time value of money—that is, the court has considered that the value of the dollar is different today relative to years ago.  The court is also mindful that noneconomic damages are inherently subjective, and no mathematical formula can substitute for this judgment.  Nonetheless, the court has considered the parties'

---

[20] See Sofie v. Fibreboard Corp., 112 Wash. 2d 636, 651-52 (1989).

submissions and finds that this damages award is not disproportionate to those in other similar cases.

In addition, 11 of the United States's 16 proposed comparative verdicts were not, in fact, comparable because they involved cases—unlike this one—in which the court found no liability.  The purpose of the court's request for comparable cases was to obtain useful comparisons for the challenging task of determining appropriate noneconomic damages.  Cases where the court did not reach the question of damages are obviously unhelpful.

Considering and weighing the facts together, Woodman is entitled to noneconomic damages of $5,000,000 for physical pain, mental suffering and anguish, disability, and disfigurement, and Mark Foley is entitled to $150,000 on his claim for loss of consortium.

## Conclusion

The court finds the United States liable as to Counts I and II.  The court awards damages to Kasey Woodman in the amount of $5,000,000 as to Count I.  The court awards damages to Mark Foley in the amount of $150,000 as to Count II.  Pursuant to 28 U.S.C. § 2678, attorney fees are limited to 25 percent of this judgment.[21]

---

[21] The parties' requests for findings of fact and rulings of law (doc. nos. 25, 26) are adopted to the extent they are not inconsistent with this order.

The Clerk of Court is directed to enter judgment in accord with this final opinion and order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

May 6, 2022

cc:    Counsel of Record